Alexander Capital, L.P. 23-1109 and 23-1164. We have Attorney Rand for the appellant, and I understand you would like to reserve two minutes for rebuttal, is that right? Yes, Your Honor. Again, take a second and feel free to arrange the microphones, each of you as need be when it's your turn. And we're ready when you are. Good morning, Your Honors. My name is William Rand. I represent the trustee, John J. Aquino, who is the appellant. This is a case about Alexander Securities, who is a registered broker dealer. It misrepresented that it had the license to perform a $20 million firm commitment underwriting for impellers. It made this false statement to induce impellers to engage them as underwriter, and also to induce impellers to take on a $5 million bridge loan to assist in the underwriting. But you have a finding of fact from Judge Rakoff that said that at the time that they made the statement, that they themselves believed that they did or would have the authority. They have . . . You said it was a misstatement, proved to be a misstatement, but a misstatement alone is not enough. They have to know that it's wrong and make the representation of that to induce the other party to rely upon. And the scienter element is missing here, according to Judge Rakoff. Well, Judge Rakoff has . . . And it's a finding of fact, so you'd have to tell us that it's clearly erroneous, right? Well, Judge Rakoff has made an error applying the law because he failed to include recklessness in the scienter standard. And . . . Well, but if they . . . it's hard to be reckless if you truly believe something. And so if they understood that they had the authority, you would have to point to a fact that they disregarded because recklessness requires knowledge of a fact that you disregard to your own demise. That's what recklessness is all about. It's an ultimate form of negligence, and you haven't identified that, nor is there a finding of . . . asked for a finding in that regard. What was your proof that they knew that they didn't have the authority and they just disregarded that fact or that they should have known? When you are a broker-dealer, you have a fiduciary duty to your client. We are the client. They are the broker. Under the law, the broker has a duty to disclose to us all material facts. They cannot hide behind their ignorance. So what is it that . . . what proof did you show that they knew that they didn't have that authority? I appreciate that they're a broker-dealer and that they're a fiduciary and that they have those responsibilities, but they still have to disregard a fact that they knew. And my question to you is what did they . . . what fact did you put into the record that they knew that they disregarded or that they didn't disclose? On May 15, 2015, FINRA told them, you do not have a license, and then shortly thereafter sent them a cease and desist and said, you must not participate in any form or manner in firm commitment offerings because you do not have a license. And after that, they did not disclose to us that they did not have a license. They continued . . . But you engaged . . . but there was a second engagement letter and there's a finding of fact that at the time of the second engagement letter, you knew that your board knew of the fact that they didn't have that authority and decided to go ahead anyhow. We were never actually told. The court . . . Now, wait a second. There's a finding of fact that you weren't. Yeah, but that's . . . if you look at the record . . . Wait a second. This is after a trial. You can't just say, Judge, we disagree with Judge Ritkoff. You have to tell me why it's clear error. So the law says if you disclose a partial truth, then you are required to disclose the full truth. So here, they said, oh, this is a minor bureaucratic snafu. This is, quote, no big deal. This will be fixed in a matter of days. These were all false statements. They had an open application to get a permission. They had no idea when it would be approved. It wasn't approved until over a year later. You just said they had no idea when they'd be approved. So it could have been a week. It could have been a month.  Yes, but the Solomon case . . . So they weren't completely disqualified from being able to do a firm commitment offer. It's that they weren't presently qualified, correct? They were completely not qualified at the time that we were their client. I use the word disqualified, and I ask you now. Did you have any proof that they were disqualified, that they would never be allowed to get a firm commitment offer? No, but they did not have the license. Okay. All right. Go ahead. So when they make a half-truth, then they have to disclose the full truth, that they have been told by FINRA that they don't have the license, that they put in an application to get the license, and they are not supposed to be involved in any firm commitment offerings while they are filing with us registration statements that say they're going to do a firm commitment offering, in complete defiance of the FINRA instruction. But after you found out about it, you went ahead . . . your board went ahead. Your board went ahead, knowing the limitation, and said, well, maybe they'll get it, and we'll go ahead with the firm offer application. No. We were never shown the firm offer application. We were never shown those documents. We were never shown the communications with FINRA. If we had known all that, we would never have filed the documents we filed. Is there evidence that once your client was on notice, that they asked? Is there any evidence that once the client learned that there wasn't a present capacity to do a firm commitment offering, that they said, well, wait a minute, let's . . . Yes. Give us some details. Yes, and they were told, oh, it's no big deal. It's a minor bureaucratic problem. There are no issues. You know, it's going to be worked out. What was the answer they got? I want to know what the inquiry is that they made. But the answer was, and it's in the quotes, it's a minor bureaucratic problem. So did the inquiry made by your client consist of, tell me a little bit more about that, or did the client say, I'd like to see the documents, I'd like to . . . I mean, I guess I'm just trying to understand. Just recall, this is all happening more than a year after they've hired Alexander. Our company is under supreme duress. They need to raise this money. They have an obligation. Just answer Judge Robinson's question, because I'm very curious to hear what the answer was. I'm not sure of the direct testimony, but, I mean, they didn't make a thorough investigation action. They were told this is not a problem. Don't worry about it. Do you not have a paid citation to where the record of the inquiry was made so we can see it? Because I thought that was the question, is what the inquiry was. Now, what did he answer with the inquiry? Well, I think it's probably close to where the . . . You know, I don't have it, but it's in the brief. I apologize. So they have a duty to do full disclosure because they are a broker with a duty to their client. They have a duty to do full disclosure because they gave half-truths that were not full, and once you give a half-truth, you're required to give a full truth. They also had a duty because they had the superior knowledge. Judge Rakoff did not apply the superior knowledge test. Here, the only person that could find out whether they had a license or not was Alexander. It is not a matter of public record. The FINRA will not tell you. It's not on the public disclosure of a broker. So where one side has the ability to know the truth and the other side has no access to it, the law says you are permitted to rely on . . . Did you raise the superior knowledge issue in the context of the motion for a directed verdict? I'm not sure I recall. I know we've raised it on . . . My understanding is that it was not raised. It was only raised in summary judgment, but I don't know. You tell me if that's wrong. I don't particularly remember that that is wrong. Okay. That's fair. You know what? Again, I'll give you the same option I gave previous counsel in the last case. You have two minutes for rebuttal. If you'd like to use them now, that's fine. If you'd prefer to hold them, that's fine, too. I'll take the two minutes rebuttal. Excellent. Thank you. Okay. Why don't we hear from counsel for the appellee? Why don't we hear from Attorney Cole? Thank you. May it please the Court, my name is Holly Cole, and I represent the Appellees Alexander Capital, Nessa Management, Joseph Amato, and Rocco Giudice-Pietro. This appeal involves the Court's two separate rulings on summary judgment and then on directed verdict, granting judgment in Alexander Capital's favor on convergence fraud and breach of contract claims. The claims arose out of two separate engagement agreements for a contemplated firm commitment IPO, the initial engagement agreement in July 2014 and the amended and restated engagement agreement in October 2015. This Court should affirm the District Court's judgment for two reasons. First, the undisputed evidence on summary judgment supports the District Court's rulings that Impellis could not have justifiably relied on the implied representations in the October 2015 engagement agreement about Alexander Capital's firm commitment capabilities because Impellis knew Alexander Capital lacked authority for firm commitment underwriting when it signed the agreement on that date, choosing to reaffirm Alexander's engagement as underwriter, and when it chose later to file its Form S-1 registration statement on a best efforts underwriting. Can I focus on the breach of contract claim as it relates to the failure to disclose? Once your client was fully aware of the absence of the FINRA license, at a time when your client knew that there was a $500,000 bridge loan in the offing, the District Court talked about that claim with reference to reliance, and I get that in the context of fraud because that's an element of the fraud claim, but I'm trying to figure out why it's not a breach of the duty of good faith and fair dealing not to share that information once they knew it, especially at a time when the other folks were on the verge of incurring a significant liability. Yes. So what the evidence showed was, although they hadn't disclosed it at the time of the August 2015 bridge loan, which was actually made in three different installments, one of which came in after the September 10th disclosure, but the evidence showed that once they disclosed it, Impellis had only spent $247,000 of the $6.5 million in funds that it received, and it did not make any decision at that point to stop proceeding with the IPO and to return the money. Rather, after it was on knowledge that there was no firm commitment underwriting, Impellis chose to reaffirm the engagement of Alexander, knowing full well that there was a risk that the IPO would have to proceed as a best efforts offering. But at that point they had already incurred the liability, right? So they're in a situation, okay, they've got to figure out how to deal with a bad situation that they're in, and they've taken out this loan, and so they can't really unwind the clock or whatever. But they could. They could. They could have repaid the funds immediately. The terms of the loans were for one year, and they could have returned the funds immediately. And there was testimony that they made the business judgment that they needed the loan. In fact, Judge Rakoff made a finding, didn't he, that they weren't really relying on advice from your client, that this was a loan that was necessitated because of other business difficulties that Impellis had incurred. Yes, that's exactly correct. When Impellis engaged Alexander, they didn't solicit any advice from Alexander about whether or not they needed operating capital. That was something that was made clear that they were pursuing all along. They made attempts to obtain bridge financing without Alexander's involvement, without consulting them, despite the fact that it was an exclusive financial advisor arrangement. And there were findings by Judge Rakoff that that's how he decided that there wasn't a reliance element with regard to any kind of – because he noted the difficulty with regard to the fact that it hadn't been disclosed, and yet there was – and one could make the argument that perhaps they were relying on the fact that they still had this authority, but they did the bridge loan regardless of whether your client had the authority to affirm offer offering or not, correct? Yes, that's correct as well. They needed this bridge financing to continue as a going concern regardless of the type of public offering, whether it was going to be a firm commitment or as a best effort. So just to be clear, I understand reliance in the context of fraud. Are you contending that reliance is an element of good faith and fair dealing, or are you making an argument as to causation of damages as it relates to the breach of contract claim? As an element of the claim. So reliance is an element of a breach of a covenant in good faith and fair dealing? No. So actually there were two claims related to the bridge loan, and the finding about reliance was to Impella's or Convergence's separate fraud claim on that exact same issue. Right, that I understand. Yes. So with respect to the breach of contract claim, what Judge Rakoff found was that they did not – that Impella's did not take on the bridge loan based on any advice from Alexander Capital. He found no causation. He saw no causal link between any kind of a recommendation they made and their determination to take the loan. That's correct. Yes. Also, in order to establish a breach of the implied duty of good faith and fair dealing, Convergent would have had to prove that the failure to disclose the lack of firm commitment prior to the bridge loan undermined the integrity of the offering. And at trial, Impella's attorney, Barrett, testified that when Impella's and the trust were alerted in September 2015 after the bridge loan, that there was an issue with firm commitment underwriting after they had closed the financing, Impella's felt it was in very good shape for the IPO. That's at Plaintiffs Appendix 926 and 943. But if the argument is, yeah, we felt we were in very good shape for the IPO because although there was a disclosure that they weren't presently licensed, there was also a reassurance that it was just a little bookkeeping thing and it would be – the licensure would arrive shortly, how does that – how does that decide the question? So in terms of Convergent's argument that this – that they relied on the post-agreement representations about whether this – their characterizations that this was a minor issue, the evidence actually does not support that characterization. The Impella's representatives who were all in attendance at the September 10th meeting where they learned of the lack of approval, considered this to be, quote, very concerning and a major problem. Jack Clark, who was the chairman of the board for Impella's, was an experienced broker-dealer himself who worked with FINRA, and he understood that the lack of firm commitment approval was not a light issue that could be quickly resolved because FINRA was not necessarily easy to deal with. He also understood that the likelihood of Alexander getting FINRA approval in the timeframe that Impella's was looking to do their public offering was highly unlikely because the approval process was out of Alexander's control. Can I ask you, again, along the lines of the questions you've been hearing, how conceptually the reliance findings of Judge Rakoff fit into the rubric of the good – the breach of contract claims? I had been under the impression, and tell me if I'm wrong, that the reliance or lack of reliance that the judge found is relevant here to the extent that the appellants are arguing that there was a violation of the duties of good faith and honest dealing, and that with respect to good faith, they were claiming that this putative failure to disclose facts impacted their decision to secure a bridge loan. And sort of that was sort of one of the elements of why it was not in good faith and why it was sort of violating their reasonable expectations. And the idea was, well, if they didn't rely, as Judge Rakoff found, they didn't actually rely on the firm commitment capability existing to get the bridge loan, then it wouldn't have any impact on their reasonable expectations of what the purpose of the contract was. I thought that was part of it. Yes. Or is it more a question of causation in terms of – I thought it was fitting into a different part. It was the covenant of good faith. I think it plays into both. Okay. Yes. As we've already discussed, he considered the evidence that – he considered the fact that there was no evidence that Impellus sought the advice on the basis that it was a firm commitment underwriting, and that was the claim that was being made, but there was no evidence presented at trial to support that. And the fact that they had been soliciting and financing on their own both prior to and after learning about the firm commitment issue went to evidence of causation. Okay. I think we have your argument. No further questions from the panel? Thank you. Why don't we hear from counsel for the appellant? Two minutes on the clock, please. First, Judge Rakoff failed to apply the presumption against jury waiver. Here there was a global agreement that had a condition precedent that Impellus settle their claims with the bridge lender. Impellus did not settle their claims with the bridge lender. The agreement said you therefore retain all your claims and rights, the parties do. When would a jury waiver ever kick in then? How could it ever be operative if there's a violation of some aspect of the settlement agreement and you say that voids the jury waiver, the jury waiver goes poof. So does the jury waiver only kick in when nobody ever sues each other? No. It's if they have a global settlement and somebody violates it. But here they didn't have a global settlement because the condition precedent wasn't satisfied, so the global settlement went out the window and everybody retained their claims and rights, including the right to a jury trial. So the condition precedent in paragraph 5 to the mutual general leases, as I understand it, you're viewing as a condition precedent to the entire agreement? Yes. I'm just curious because there's whereas clauses that talk about how this is one of many claims, they want to settle all their claims, whereas, whereas, why wouldn't the notion that this is a condition precedent have appeared in a way that signaled that it was a condition precedent, not only as to the paragraph in which it was embedded, but as to the entirety of the agreement? I don't think the agreement is phrased very well, but that's clearly the intent, and if there's any ambiguity, it has to be in favor of the jury trial because it's a fundamental right to have a jury trial and there is a real presumption in favor of jury trials, and here I believe the agreement is clear that it lets you retain your right to a jury trial. If there's any confusion between, you know, the later term and the earlier term in a conflict, the conflict should be resolved in favor of a jury trial. Finally, on the breach of contract. We're going to say finally because we kept you up earlier, so I'll let you get in one last quick point. Okay, so on the breach of contract claims, we submit that intent is not required for the breach of contract claims and that they had a duty under the contract and as a broker to disclose their communications with FINRA and the failure of having a firm commitment license, and they did not make those disclosures, and therefore they should be found liable for breach of contract. Thank you, Your Honors. Thank you very much to both of you. We appreciate your arguments, and we will take the case under advisement.